## In re SHEA.

(District Court, D. Massachusetts. August 13, 1917.)

No. 20231.

1. COURTS ⬯365—PRECEDENTS—STATE COURTS.

In determining, in bankruptcy proceedings, the nature of transactions between the bankrupt and others, the decisions of the highest state court, if not controlling, are of great weight.

2. BROKERS ⬯24(1)—STOCKBROKERS—GAMING CONTRACTS—WHAT AMOUNT TO.

A broker, carrying stocks on margin for a customer, according to the custom of brokers with reference to speculative accounts, must, to prevent the transaction from being a gaming one and to put himself right, show that he had under his control, free from the just demands of other customers and available for delivery to the particular customer, the stocks delivery of which the customer, on payment, will be entitled to demand.

3. BANKRUPTCY ⬯407(5)—DISCHARGE—FALSE STATEMENTS.

A broker informed customers carrying stocks on margins that he had such stocks for them. The broker in fact had no such stocks on hand, subject to the demands of customers, free from other demands, as required by the custom of brokers. Relying on the broker's statement, customers made payments on margins, and subsequently made other payments. *Held* that, where the broker was conversant with the facts, his discharge in bankruptcy must be denied, on the ground that he made false statements to obtain money, even though he did not consider the statements false, and expected thereafter to acquire such stocks for the customers.

In Bankruptcy. In the matter of the bankruptcy of Daniel J. Shea. On application for discharge. Application refused.

Byron W. Reed, of Boston, Mass., for bankrupt.

Dunbar, Nutter & McLellan and Jacob J. Kaplan, all of Boston, Mass., for creditors.

MORTON, District Judge. The specification of objection based on the failure to keep adequate books of account is disposed of by the referee's finding.

The specification of objection charging that money was obtained upon statements in writing that were materially false is, upon the findings of the referee and the inferences to be drawn therefrom, sustained. The learned referee has not found, as I construe his report, that the objecting creditors were merely betting with the bankrupt or his company on the course of prices. He says that:

"It was understood by both parties that these transactions were carried on with the bankrupt as a broker, and as speculative margin accounts, according to the custom of brokers in relation thereto." (Report, p. 4.)

[1, 2] The transactions took place in Massachusetts, and in determining the legal effect of them the decisions of the highest court of this state are, if not controlling, certainly of great weight. The duty of the broker has been stated by the Massachusetts Supreme Judicial Court as follows:

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"The broker, to put himself right in such a case as the one now before us, must show that he has under his control, free from the just demands of other customers, and available for delivery to the particular customer whose case is in question, the stocks of which that customer, upon payment, will be entitled to demand delivery." Greene v. Corey, 210 Mass. 536, 548, 97 N. E. 70, 72.

[3] The statements of account rendered by the bankrupt, or with his knowledge and approval, to the objecting creditor, specifically said that there was "on hand" for them stock which the bankrupt or his company did not own and had no contract for delivery of. The learned referee finds that:

"The bankrupt did not in fact have any other stock of these descriptions at that time available, either in possession or by right of any contract, for delivery to the creditor, if payment had been made by the creditor and demand had been made for the stock." (Report, pp. 3, 4.)

After these statements had been made to the creditor, payments to the bankrupt or his company were made by her. Each customer's account seems to have been treated as an entirety, and not as a series of unrelated purchases or sales of different stocks. Payments made subsequent to the statements must, I think, be regarded as having been procured, in part, at least, by the showing of stock on hand for the customer. This fact is not categorically stated by the learned referee. He says, however:

"The objecting creditors made payments to the bankrupt to be credited on the account, believing that the bankrupt was carrying on margin for them, respectively, the shares of stock recited in the last monthly statement of accounts as being on hand." (Report, p. 2.)

The creditor's belief that the bankrupt had the stocks on hand was undoubtedly one of the inducements to further payments by the creditor.

It does not appear that the bankrupt understood that the statement that stocks were on hand was false. But he knew what the facts were, and he knew what was being represented to the customers; and he cannot escape responsibility for what was said upon the ground that he did not realize the legal effect of the language used. Nor does the fact, if it be so, that the bankrupt's intention was to buy and deliver shares, if the customer should call for them and pay the balance due, save the statement that shares were on hand from being false.

The false statement, in order to bar discharge, must have been made for the purpose of obtaining money or credits. The creditor's stocks were being carried on margin. If it became necessary to increase the margin, further payments might be made to the bankrupt or his company by her. In doing so, she would act, as both parties understood, in reliance on the statement. This was one of the reasons why it was made by the bankrupt or his company. It is not necessary that the sole purpose of the statement should have been to obtain money or credits. If that be one purpose, and the statement be knowingly false, it is sufficient to bar a discharge.

Application for discharge refused.